# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
JUDICIAL WATCH, INC.,                   )
                                        )
              Plaintiff,                )
                                        )
       v.                               )        Civil Action No. 04-907 (RBW)
                                        )
UNITED STATES DEPARTMENT OF             )
HOMELAND SECURITY,                      )
                                        )
              Defendant.                )
                                        )
_____)

## MEMORANDUM OPINION

Judicial Watch, Inc. ("Judicial Watch") brings this action against the United States

Department of Homeland Security (the "DHS") under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552 (2006), seeking the disclosure of records relating to a survey of illegal

immigrants.  Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 5, 10.  Currently

before the Court are the parties' renewed cross-motions for summary judgment concerning the

issue of whether the DHS conducted an adequate search for records responsive to Judicial

Watch's FOIA request.  Upon careful consideration of the parties' submissions,[1] the Court

_____

[1] In addition to the filings already identified, the Court considered the following submissions and supporting exhibits in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendant's Renewed Motion for Summary Judgment ("DHS's Mem."); (2) the Plaintiff's Renewed Cross-Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem."); (3) the Plaintiff's Statement of Material Fact in Support of Renewed Cross-Motion for Partial Summary Judgment ("Pl.'s Facts"); (4) the Defendant's Reply to Plaintiff's Renewed Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("DHS's Reply"); (5) the Defendant's Response to Plaintiff's Statement of Facts in Support of Cross Motion for Summary Judgment ("DHS's Fact Response"); (6) the Defendant's Statement of Material Facts as to Which There is No Genuine Issue in Support of its Renewed Motion for Summary Judgment ("DHS's Facts"); and (7) the Plaintiff's Reply to Defendant's Opposition to Plaintiff's Renewed Cross-Motion for Summary Judgment ("Pl.'s Reply").

concludes for the following reasons that the DHS's motion must be denied without prejudice, and that Judicial Watch's motion must be granted in part and denied in part without prejudice.

## I. BACKGROUND

The DHS is comprised of several component agencies, two of which are implicated in this case: United States Customs and Border Protection ("Customs") and United States Citizenship and Immigration Services ("Immigration").  See Organizational Chart, U.S. Department of Homeland Security, (Nov. 5, 2010), http://www.dhs.gov/xlibrary/assets/dhs-orgchart.pdf.  The United States Border Patrol ("Border Patrol") is a subcomponent of Customs, see DHS's Mem., Declaration of Magda Ortiz ("Ortiz Decl.") at 1, and it consists of numerous "[s]ector offices" covering different regions of the United States, DHS's Facts ¶¶ 45-46.  The Office of Records Services (the "FOIA Office"), a component office of Immigration, processes FOIA requests on behalf of the Border Patrol.  DHS's Mem., Ortiz Decl. at 1.

On February 27, 2004, Judicial Watch submitted a FOIA request to the DHS seeking records relating to a survey of illegal immigrants conducted by the Border Patrol in January 2004 ("amnesty survey").  Pl.'s Facts ¶ 2; DHS's Facts ¶ 1.  Specifically, the request sought the following eight categories of records:

(1)      Any and all records that refer and/or relate to a survey, developed by Border Patrol officials in Washington, of illegal aliens detained at the US-Mexican border, that had sought to establish whether "rumors of amnesty" had influenced their decision to cross into the United States.

(2)      Any and all records that refer and/or relate to the number(s) of illegal immigrants entering the United States as a result of the amnesty and/or guest worker program and/or immigration reforms proposed by President George W. Bush on January 7, 2004.

(3)      Any and all records that refer and/or relate to the decision to discontinue the survey on or about January 27, 2004.

(4)      Any and all records that refer and/or relate to the results of any survey of illegal immigrants entering the United States as a result of the amnesty and/or guest worker program and/or immigration reforms proposed by President George W. Bush on January 7, 2004.

(5)      Any and all records that refer and/or relate to the number of illegal immigrants apprehended in San Diego county from January 7, 2004 to the present.

(6)      Any and all records that refer and/or relate to the reported 13 questions contained on said questionnaire(s).

(7)      Any and all records that refer and/or relate to the decision to instruct border patrol agents "not to talk about amnesty, an increase in apprehensions, or give comparisons of past immigration reform proposals" when talking with the media.

(8)      The "talking points" distributed nationwide in which border agents are "not to talk about amnesty[,] an increase in apprehensions, or give comparisons of past immigration reform proposals."

Pl.'s Facts ¶ 2.  Judicial Watch received a letter from the DHS acknowledging receipt of its

FOIA request on March 2, 2004.  Id. ¶ 3.   After receiving no "substantive response" from the

DHS, Judicial Watch instituted this lawsuit on June 3, 2004.  Id. ¶¶ 5-7.

Judicial Watch's FOIA request was then forwarded to the Border Patrol on June 10,

2004.  DHS's Facts ¶ 2.  Upon receiving the request, the Border Patrol "sent out search requests"

only to those "offices and personnel that were likely to have responsive records."  Id. ¶ 3.

"These offices were the [Border Patrol's] Southwest Border Sectors and Headquarters' liaison

agents; the Office of Congressional Affairs; the Office of Policy and Planning, and the [Border

Patrol's] Headquarters [l]iaison [a]gents who had duties relating to the Southwest border."  Id.

The "search requests directed the recipients to provide a copy of all responsive records[, and] if

no records were found, that information was to be conveyed as well."  DHS's Mem., Ortiz Decl.

at 5.  The Border Patrol "determined that other offices within [Customs] would not have

responsive records, and did not forward the FOIA request to those offices."  DHS's Facts ¶ 4.

Responsive records were located by the various offices and then forwarded to the FOIA Office for processing.  Id.

The DHS produced its first set of responsive records to Judicial Watch on May 6, 2005. Id.; Pl.'s Facts ¶ 8.  Of the 965 pages of records it identified as responsive to Judicial Watch's FOIA request, the DHS released 88 pages in full and 852 pages in part, and it withheld 25 pages in full.  DHS's Facts ¶ 4.  On June 15, 2005, the DHS released to Judicial Watch five pages previously withheld in full, and on August 26, 2005, it released a spreadsheet containing results from the amnesty survey.  DHS's Facts ¶¶ 7-8; Pl.'s Facts ¶ 11.

On February 9, 2006, this Court granted the DHS's motion for a 90-day stay to allow the agency to conduct a second search for responsive records.  See February 9, 2006 Order, Judicial Watch v. DHS, Civil Action No. 04-907 (D.D.C.) (RBW).  That same day, "the Acting Commissioner of [Customs] signed a memorandum directing every office within [Customs] to conduct a new search for records responsive to [Judicial Watch's] FOIA request."  DHS's Facts ¶ 13 (emphasis added).  "The February 2006 search was more extensive than the prior searches because every [Customs] office was ordered to search for responsive documents instead of the offices where such documents would logically reside."  Id.  The Acting Commissioner's memorandum "set[] forth the eight categories of information specified in the original FOIA request by [Judicial Watch]" and "directed each office to identify potentially responsive documents."  Id. ¶ 14 (internal quotation marks omitted).  The memorandum also instructed responding offices to "describe[] in detail how the search was actually conducted," including information such as (1) "who in your office directed the search"; (2) "how the relevant agency files are kept"; (3) "where these files are located"; (4) "where your office looked for responsive records"; (5) "the date(s) you conducted this search"; (6) "the search terms or process used by

4

your office to conduct this search when searching databases or other record systems"; and (7)

"which documents were identified using each such search."  DHS's Mem., Declaration of Shari

Suzuki ("First Suzuki Decl."), Exhibit ("Ex.") 1 (Memorandum re Search for Responsive

Records) at 2.  According to the DHS, "[e]ach office within [Customs] conducted a search for

responsive records and provided information . . . in accord with the [Acting] Commissioner's

memorandum."  DHS's Facts ¶ 15.  Following this second search, the DHS produced 125 pages

of responsive records to Judicial Watch on May 22, 2006.  Pl.'s Facts ¶ 16.  The DHS also

provided Judicial Watch with declarations from agency officials "purport[ing] to describe the

second search performed by [the] DHS and its findings."  Id.

     Judicial Watch thereafter moved for partial summary judgment, asserting that both of the

DHS's searches were inadequate, in response to which the DHS cross-moved for summary

judgment.  By order dated August 10, 2007, the Court denied both parties' summary judgment

motions without prejudice because the DHS had "not attempted to demonstrate the adequacy of

its first search" and instead opted "to presume incorrectly that its voluntary second search ha[d]

obviated any need to continue to defend the adequacy of its first search."  August 10, 2007 Order

at 12, Judicial Watch v. DHS, Civil Action No. 04-907 (D.D.C.) (RBW) ("August 10, 2007

Order").  Because the Court found that "the adequacy of the two searches [was] inextricably

intertwined and must be evaluated collectively," it directed the parties "to file renewed motions

addressing the [DHS's] efforts to respond to [Judicial Watch's] FOIA request as a whole,

accompanied by declarations addressing the nature, scope, and overall adequacy of both searches

under the FOIA."  Id. at 10, 12 (emphasis in original).  In accordance with this order, the parties

have submitted renewed cross-motions for summary judgment along with supplemental

declarations.

## II.  STANDARD OF REVIEW

"FOIA cases typically and appropriately are decided on motions for summary judgment."

Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (collecting

cases).  Summary judgment must be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  In assessing whether a genuine issue of material fact

exists, the Court must draw all reasonable inferences in favor of the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The party opposing a motion for

summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .

must set forth specific facts showing that there is a genuine issue for trial."  Id. at 248.

## III.  ANALYSIS

### A.      Preliminary Issues Concerning the DHS's Renewed Motion for Summary Judgment and Supporting Declarations

The Court must initially address several procedural irregularities identified by Judicial

Watch concerning the DHS's renewed motion for summary judgment.  First, Judicial Watch

contends that the DHS's motion for summary judgment should be denied for failure to comply

with Local Civil Rule 7(h), Pl.'s Mem. at 5-6, which directs that "[e]ach motion for summary

judgment shall be accompanied by a statement of material facts as to which the moving party

contends there is no genuine issue, which shall include references to the parts of the record relied

on to support the statement."  While acknowledging its failure to include a statement of

undisputed material facts with its renewed motion for summary judgment, the DHS maintains

that this was a "clerical error" that did not prejudice Judicial Watch.  DHS's Reply at 1-2.  The

Court agrees.  Although the DHS technically did not comply with Local Civil Rule 7(h), its

memorandum in support of its renewed motion for summary judgment contained a detailed

factual statement with citations to supporting declarations.  <u>See</u> DHS's Mem. at 2-21.  And the

DHS subsequently sought to remedy its omission by moving for leave to file a statement of

undisputed facts, which Judicial Watch did not oppose and which the Court granted.  <u>See</u>

December 17, 2007 Minute Order, <u>Judicial Watch v. DHS</u>, Civil Action No. 04-907 (D.D.C.)

(RBW).  This supplemental filing is, moreover, largely identical to the factual recitation in the

DHS's memorandum in support of its renewed summary judgment motion.  <u>Compare</u> DHS's

Facts ¶¶ 1-53, <u>with</u> DHS's Mem. at 2-21.  Given the lack of prejudice to Judicial Watch and in

the interest of judicial economy, the Court will not deny the DHS's motion based on its failure to

comply with Local Civil Rule 7(h).

Second, Judicial Watch notes that after the DHS filed its renewed motion for summary

judgment on October 30, 2007, it submitted a "corrected copy" of the motion on November 14,

2007, which made "substantive changes" to the original motion.  Pl.'s Mem. at 5.  Judicial

Watch argues that the "corrected brief should not be considered" by the Court, <u>id.</u> at 5 n.1,

presumably because the DHS did not seek leave of Court before submitting the revised filing.  It

does appear that the DHS's corrected brief made more than "typographical and formatting"

revisions, <u>id.</u> at 5, but the Court will nonetheless consider the brief because it was submitted six

days before Judicial Watch filed its opposition brief, and thus Judicial Watch had a sufficient

opportunity to (and in fact did) respond to the "substantive changes" made in the DHS's

corrected brief.[2]

---

[2] Notwithstanding the foregoing rulings, counsel for the DHS is advised to exercise greater diligence in ensuring that future filings in this action comport with the Court's Local Rules and the Federal Rules of Civil Procedure.

Third, Judicial Watch asserts that one of the declarations submitted by the DHS in support of its motion—the declaration of Walter E. Kittle—is not under oath and subject to the penalty of perjury and should therefore be disregarded by the Court. Id. at 14. It also urges the Court to disregard statements in the declaration of Johnny Meadors that reference the Kittle declaration. Id. Because the DHS has not responded to these assertions, see generally DHS's Reply, the Court will deem the arguments conceded. See Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd 98 Fed. App'x 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a [party] files an opposition to a dispositive motion and addresses only certain arguments raised by the [movant], a court may treat those arguments that the [non-movant] failed to address as conceded."). Accordingly, in considering the parties' cross-motions for summary judgment, the Court will disregard the Kittle declaration as well as statements in other filings that reference the Kittle declaration.

## B.    Adequacy of the Search

The parties agree that the adequacy of the DHS's search efforts is the only FOIA issue before the Court. See DHS's Mem. at 32 ("[T]he adequacy of [the DHS's] search . . . is the only issue before the Court"); Pl.'s Mem. at 7 ("The only FOIA issue in this case is whether the DHS'[s] searches, in their totality, comply with its statutory obligation to conduct a reasonable search.").

When a FOIA requester challenges the adequacy of an agency's search for records, "the agency must show, viewing the facts in the light most favorable to the requester, . . . that it has conducted a 'search reasonably calculated to uncover all relevant documents.'" Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). "The question is not 'whether there might exist any

other documents possibly responsive to the request, but rather whether the <u>search</u> for those documents was <u>adequate</u>.'" <u>Id.</u> (emphasis in original).  Thus, "the failure of an agency to turn up one specific document in its search does not alone render a search inadequate," for "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  <u>Iturralde v. Comptroller of Currency</u>, 315 F.3d 311, 315 (D.C. Cir. 2003) (citation omitted); <u>see also</u> <u>SafeCard Servs., Inc. v. SEC</u>, 926 F.2d 1197, 1201 (D.C. Cir. 1991) ("Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." (citations omitted)).  "A FOIA search is sufficient if the agency makes 'a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" <u>Baker & Hostetler LLP v. U.S. Dep't of Commerce</u>, 473 F.3d 312, 318 (D.C. Cir. 2006) (quoting <u>Nation Magazine v. U.S. Customs Serv.</u>, 71 F.3d 885, 890 (D.C. Cir. 1995)).  The "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested," <u>Campbell v. Dep't of Justice</u>, 164 F.3d 20, 28 (D.C. Cir. 1998) (internal quotation marks omitted), and it must pursue any leads to responsive records that are "both clear and certain," <u>Kowalczyk v. Dep't of Justice</u>, 73 F.3d 386, 389 (D.C. Cir. 1996).  Ultimately, "[t]he adequacy of the search . . . is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." <u>Steinberg</u>, 23 F.3d at 551 (quoting <u>Weisberg</u>, 745 F.2d at 1485).

To demonstrate the adequacy of its search at the summary judgment stage, "the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith," <u>id.</u>, "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched," <u>Iturralde</u>, 315 F.3d at 313-14 (internal

quotations and citation omitted; alterations in original).  At minimum, the agency affidavits must "describe . . . what records were searched, by whom, and through what process." Steinberg, 23 F.3d at 552.  Moreover, "[a]gency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., 926 F.2d at 1200 (citations omitted).

In response to an agency's affidavit, a "plaintiff may . . . provide 'countervailing evidence' as to the adequacy of the agency's search." Iturralde, 315 F.3d at 313-14 (quoting Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)).  If the plaintiff provides "sufficient evidence to raise 'substantial doubt' concerning the adequacy of [the agency's] search," particularly when there are "'well defined requests and positive indications of overlooked materials,' summary judgment is inappropriate." Id. at 314 (quoting Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999)).  On the other hand, "trivial matters, such as typographical errors and minor ambiguities" in the agency's submissions "support neither [an] allegation that [the agency's] search procedures were inadequate, nor an inference that it acted in bad faith." SafeCard Servs., 926 F.2d at 1202.  "[I]n the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).

### 1.    The DHS's First Search

As noted, the Court previously denied the parties' cross-motions for summary judgment without prejudice because the DHS failed to provide any information concerning its first search for responsive records.  See August 10, 2007 Order at 12.  While the DHS asserted at that time

that its second search mooted any inquiry regarding the adequacy of its first search, the Court could not conclusively evaluate that assertion because the agency's declarations did not sufficiently explain the extent to which the two searches overlapped.  See id. at 8 n.11.  With its renewed motion, however, the DHS has submitted declarations clarifying that the second search "included the same areas searched in the first search plus additional areas," DHS's Mem., Third Declaration of Cynthia Atwood ¶ 8, and explaining that although the DHS did not resubmit records found during the second search that were previously provided to Judicial Watch as a result of the first search, the "vast majority of the 965 pages that were found during the first search were all accounted for anew during [Custom's] search in February 2006," except for twenty-three pages that were not revealed during the second search, DHS's Mem., Second Declaration of Shari Suzuki ¶ 11.  These declarations thus indicate that the second search was not only broader than the first search, but also duplicative of it, insofar as the second search included the same offices and yielded substantially the same records as the first search.  In view of these clarifying representations, which Judicial Watch has not disputed, it appears that the Court can assess the adequacy of the DHS's search efforts based solely on the agency's descriptions of its second, more comprehensive search.  Accordingly, the Court will proceed to analyze the adequacy of the DHS's second search.

## 2.    Adequacy of the Agency Declaration Describing the DHS's Second Search

Judicial Watch raises several challenges to the declaration of DHS official Shari Suzuki, which describes the agency's second search for responsive records.  See Pl.'s Mem. at 10-17. Among other things, Judicial Watch contends that the declaration omits required information regarding the agency's searches of certain component offices within Customs.  Id. at 13.  The DHS yet again fails to respond to Judicial Watch's arguments.  See generally DHS's Reply.

Nonetheless, based upon its independent review of the record in this case, the Court finds that the Suzuki declaration adequately describes the searches of some offices, but that other descriptions are insufficient for the agency to meet its burden at the summary judgment stage.

Starting first with the inadequate descriptions, the Suzuki declaration omits necessary details regarding the searches of several component offices within Customs.  For instance, the search description for the Office of International Affairs fails to explain who conducted the search, how it was conducted, or what search terms the office used.  See DHS's Mem., First Suzuki Decl. ¶ 11.  Likewise, the search description for the Office of the Commissioner, while including the search terms used by the office, does not describe how the search was conducted or what records were searched.  See id. ¶ 13.  And the search descriptions for both the Office of Congressional Affairs and the Office of Intelligence fail to specify the search terms used by those offices.  See id. ¶ 12, 22.  Under the law of this Circuit, the omission of such information from the agency declarations precludes the entry of summary judgment in the DHS's favor.[3]  See Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990) ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.").

---

[3] Perplexingly, this information was omitted from the DHS declarations despite the fact that the memorandum of the Acting Commissioner of Customs explicitly directed each office to "describe[] in detail how the search was actually conducted," including information such as (1) "who in your office directed the search"; (2) "how the relevant agency files are kept"; (3) "where these files are located"; (4) "where your office looked for responsive records"; (5) "the date(s) you conducted this search"; (6) "the search terms or process used by your office to conduct this search when searching databases or other record systems"; and (7) "which documents were identified using each such search."  DHS's Mem., First Suzuki Decl, Ex. 1 (Memorandum re Search for Responsive Records) at 2.

The inadequacy of the foregoing search descriptions is further illustrated when they are compared to the detailed search descriptions of other offices provided in the Suzuki declaration. Take, for example, the search description for the Office of Field Operations; the Suzuki declaration states (1) that the search "was directed by the Assistant Commissioner [of the] Office of Field Operations"; (2) that the office's headquarters instructed each of its "field office components . . . to conduct searches pursuant to the memo from the Acting Commissioner [of Customs]"; (3) that the office's electronic files are kept in an electronic mail archive and a computer mainframe, while hard copies are kept in file cabinets; (4) that the office used search terms related to "border patrol survey" and "amnesty"; (5) that it "searched all of their files with no date limitations"; and (6) that the office identified sixteen responsive documents consisting of a "memorandum to the field, a chart showing the number of alien interceptions for the month of February 2004, information regarding the number of undocumented aliens intercepted during a three-month period in 2005 and 2006, and thirteen monthly Inspection Summary Reports." DHS's Mem., First Suzuki Decl. ¶¶ 9-10.  Other examples of adequate search descriptions include those for the Office of Policy and Planning, the Office of Public Affairs, the Office of Information Technology, the Office of Chief Counsel, all of which detail who conducted the searches, the form and location of the files searched, how the searches were conducted, the specific search terms utilized, and whether responsive records were discovered.  See id. ¶¶ 14-16, 18.  Although the Court finds these descriptions sufficiently detailed for the DHS to meet its burden of showing the reasonableness of its search, the inadequacy of the search descriptions for other components, such as the Office of International Affairs, the Office of the Commissioner, the Office of Congressional Affairs, and the Office of Intelligence, precludes the entry of summary judgment in favor of the DHS.  See Oglesby, 920 F.2d at 68.  Thus, the DHS will be

directed to submit a supplemental declaration for these components taking into account the deficiencies identified by the Court.[4]

### 3.    Alleged Inconsistent and Erroneous Statements of the DHS

Judicial Watch also points to several alleged inconsistent and erroneous statements of the DHS in seeking to challenge the adequacy of its search, see Pl.'s Mem. at 10-13, none of which the Court finds convincing.  First, Judicial Watch highlights the following inconsistency in the Suzuki declaration regarding the scope of the agency's search: while the declaration initially states that "[e]ach [Customs] office conducted its own search for records," DHS's Mem., First Susuzki Decl. ¶ 7, it later explains that four offices did not perform such a search because the subject matter of Judicial Watch's FOIA request was well beyond the scope of the offices' functions, see id. ¶¶ 25-28 (stating that the Office of Training and Development, the Office of Finance, the Office of Human Resources Management, and the Office of the Special Assistant to the Commissioner for Equal Employment Opportunity did not perform searches for responsive records upon receiving the Acting Commissioner's memorandum).  To be sure, these two parts of the Suzuki declaration do conflict.  But it seems that the first statement was simply an overbroad generalization that failed to account for later statements in the declaration relaying specific details regarding the searches of the individual offices.  In other words, the internal inconsistency appears to be the result of an oversight rather than an attempt to mislead Judicial Watch or the Court, and thus does not evince bad faith nor constitute countervailing evidence raising substantial doubts as to the adequacy of the agency's search.  See SafeCard Servs., 926 F.2d at 1202 ("[M]inor ambiguities" in an agency's submissions "support neither [an] allegation

---

[4] The Court has not endeavored to provide an exhaustive list of the deficient search descriptions in the DHS declarations.  Rather, it has identified examples of both deficient and adequate search descriptions with the expectation that the DHS will submit a supplemental declaration containing the requisite level of detail taking into account the exemplars provided by the Court.

that [the agency's] search procedures were inadequate, nor an inference that it acted in bad faith.").

Second, Judicial Watch emphasizes the DHS's contention that "'none of the components searched in response to [Judicial Watch's] FOIA request (other than the CBP Commissioner's Executive Secretariat) maintain[] a centralized file system.'"  Pl.'s Mem. at 11 (quoting DHS's Mem. at 25).  Contrary to this assertion, Judicial Watch argues, the DHS's own search descriptions indicate that several offices included in the agency's second search do in fact have "centralized file systems."  Id.  This second argument by Judicial Watch takes the DHS's statement out of context.  Indeed, the language Judicial Watch quotes from the DHS's brief is taken, in turn, from a declaration describing the agency's first search for records.  See DHS's Mem. at 25 (citing id., Ortiz Decl. at 5).  And that search, as previously noted, included a much smaller group of offices than the second search.  See DHS's Facts ¶ 3, 15 (stating that the first search included the "[Border Patrol's] Southwest Border Sectors and Headquarters' liaison agents; the Office of Congressional Affairs; . . . the Office of Policy and Planning, and the [Border Patrol] Headquarters [l]iaison [a]gents who had duties relating to the Southwest border," whereas the second search included "every [Customs] office").  Read in context, then, the DHS was stating only that none of the offices included in the first search maintain centralized file systems except for the Executive Secretariat for the Customs Commissioner.  Because this statement does not conflict with the DHS's descriptions of its second search,[5] the purported inconsistency emphasized by Judicial Watch does not actually exist.

---

[5] While the Suzuki declaration states that the "Executive Secretariat tracks correspondence sent to the [Office of Congressional Affairs] by entering information . . . into a controlled database maintained by [the] Executive Secretariat," DHS's Mem., First Suzuki Decl. ¶ 12, that statement is consistent with the DHS's qualification that none of the components included in the first search maintained a centralized file system "other than the CBP Commissioner's Executive Secretariat," DHS's Mem. at 25; see also CBP Organizational Chart (Dec. 11, 2011), (continued . . .)

Third, while the DHS maintains that "[t]he documents that were released . . . as a result of the [second] search only included those responsive documents that were not previously released," DHS's Mem. at 20, Judicial Watch notes that "a comparison of the two productions reveal[s] that [the] DHS did in fact reproduce documents previously produced to Judicial Watch," Pl.'s Mem. at 12.   The DHS's production of duplicate documents, Judicial Watch contends, "further indicates inconsistent or erroneous statements" on the agency's part.  Id.  In response to this contention, the DHS admits that it failed to identify six pages as previously submitted, but claims that with so many documents at issue, "it is not unforeseeable that human error would lead to the accidental re-submission of six (6) pages."  DHS's Reply at 9.  The Court agrees that this inconsequential error does not remotely suggest bad faith or an inadequate search on the agency's part.  See SafeCard Servs., 926 F.2d at 1202.

The fourth purported inconsistency noted by Judicial Watch concerns the DHS's characterization of the Border Patrol's amnesty survey.  See Pl.'s Mem. at 12-13.  Although the DHS refers to the amnesty survey as "informal and ad hoc," DHS's Mem. at 5, Judicial Watch contends that released records suggest the use of more formal procedures, see Pl.'s Mem. at 12-13.  To demonstrate its point, Judicial Watch cites a "Temporary Guest Worker Questionnaire Fact Sheet" released by the DHS stating that "the Office of Border Control Field Intelligence Center located in El Paso, Texas was tasked with collecting and analyzing the results of the Priority Intelligence Requirement."  Id. at 12 (quotation marks and citation omitted; emphasis in original).  Judicial Watch also quotes language from DHS questionnaires stating that "the Office of Border Patrol Intelligence is requiring that the below questionnaire be completed for aliens,"

(. . . continued)
http://www.cbp.gov/linkhandler/cgov/about/organization/orgcha1.ctt/orgcha1.pdf  (showing that the Executive Secretariat is not part of the Office of Congressional Affairs).

that the "minimum collection <u>requirement</u> is five aliens per twenty four-hour period," and that "[e]ach shift will be <u>required</u> to submit two completed [Priority Intelligence Requirement] forms each day." <u>Id.</u> at 12-13 (quotation marks and citation omitted; emphasis in original).

Judicial Watch again has not identified a genuine inconsistency. According to the DHS, it characterized the amnesty survey as "informal and ad hoc" because there was "no formalized methodology or record keeping." DHS's Mem. at 28; <u>see</u> DHS's Reply, Declaration of Johnny Meadors ("Meadors Decl.") ¶ 4 (stating that while some Border Patrol sectors "used a printed form, varying in type and appearance, . . . other sectors conducted verbal inquiries of apprehended illegal immigrant[,]" and "[t]he result[s] of some of the inquiries taken verbally were conveyed telephonically to the Headquarters unit [of the Border Patrol] and were never memorialized in a written format"). Contrary to Judicial Watch's argument, this characterization of the amnesty survey does not conflict with the DHS's usage of terms such as "requirement" and "tasked with" in forms related to the survey. Indeed, it is entirely plausible that the Border Patrol "required" that the surveys be conducted without imposing uniform record-keeping procedures across all sector offices. Given the reasonable explanation provided by the DHS, the Court affords no weight to Judicial Watch's speculative argument.

In sum, the Court finds that the Judicial Watch has not identified inconsistencies or erroneous statements by the DHS sufficient to rebut the presumption of good faith accorded to the DHS declarations or to create substantial doubt as to the adequacy of the agency's search.

### 4.    Alleged Missing and Overlooked Records

Judicial Watch also points to several examples of alleged missing and overlooked records, which it claims cast doubt on the adequacy of the DHS's search. <u>See</u> Pl.'s Mem. at 15-16. First, Judicial Watch argues that the DHS has "failed to produce documents regarding the

decision to undertake the [amnesty s]urvey" and "the document that ultimately terminated . . . the [s]urvey." Id. at 15.  In response, the DHS contends that many of the "documents [Judicial Watch] alleges exist were not in fact created," DHS's Reply at 8, reiterating that the amnesty survey was "informal and ad hoc," DHS's Mem. at 28.  And regarding the termination of the amnesty survey, the DHS admits that the "agents involved remember an e-mail directing a halt to the survey," but explains that those agents "cannot recall . . . who originated the e-mail and [the Border Patrol's] search for a copy of that e-mail has been unsuccessful."  DHS's Reply, Meadors Decl. ¶ 5.

The Court once again is not persuaded by Judicial Watch's position.  It bears repeating that "the failure of an agency to turn up one specific document in its search does not alone render a search inadequate," for "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde, 315 F.3d at 315 (citation omitted).  Ignoring this principle, Judicial Watch offers a speculative argument regarding "missing documents" that is improperly directed not at search methods but at search results.  The DHS has, moreover, submitted a declaration explaining that the records Judicial Watch seeks either never existed or could not be located through a reasonable search.  See DHS's Reply, Meadors Decl. ¶¶ 2-6.  Because this declaration is "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents,'" SafeCard Servs., 926 F.2d at 1200 (citations omitted), Judicial Watch's position on this point must be rejected.

Second, Judicial Watch maintains that the DHS's use of the term "Priority Intelligence Requirement" in documents related to the amnesty survey indicates that more records must exist because that is a term of art "used by all members of the Intelligence Community, regardless of

18

affiliation, to reference a particular intelligence need."  Pl.'s Mem. at 16 (emphasis omitted).

However, according to the DHS, "[t]he Border Patrol is not a part of the 'Intelligence

Community,'" and it therefore does not "attach the same significance" to the term ""Priority

Intelligence Requirement" as would a "military organization or a national intelligence agency."

DHS's Mem., Declaration of Daniel Hiebert ¶ 2, 5.  In the parlance of the Border Patrol, the term

"Priority Intelligence Requirement," from its perspective, denotes "merely a request for

information that is more important than an average request for information."  Id. ¶ 5.  Thus, the

DHS has once again responded to Judicial Watch's arguments with an agency declaration

entitled to a presumption of good faith—a presumption that cannot be overcome by the tenuous

assertion that Border Patrol employees must have been using a term the way it is commonly used

in the intelligence community.   Simply put, Judicial Watch's claims that additional documents

relating to the amnesty survey must exist are "hypothetical assertions" that are "insufficient to

raise a material question of fact with respect to the adequacy of the agency's search."  Oglesby,

920 F.2d at 67 n.13 (citation omitted).

   Third, Judicial Watch notes that according to released records, "[t]he Office of

Intelligence was the tasking office [for the amnesty survey]," yet the DHS claims that no

responsive documents were found by that office. Pl.'s Mem. at 16-17.  In view of the Court's

earlier ruling, supra at 13-14, directing the DHS to file supplemental declarations to correct any

deficient search descriptions (which would include the search description for the Office of

Intelligence), the Court will defer consideration of this issue because it cannot determine the

adequacy of the Office of Intelligence's search without a more detailed description of what that

search entailed.

Fourth, Judicial Watch highlights statements in the DHS's reply brief indicating that the agency has failed to provide responsive records that are admittedly in its possession.  Pl.'s Reply at 1-3.  Specifically, in response to claims by Judicial Watch that the DHS had provided statistics falling outside the time period encompassed in its FOIA request, the DHS states the following:

> In order to be responsive to the FOIA, and following [Judicial Watch's] clarification in its Opposition of the types of records and time frame for which it wants statistics, [the DHS] is willing to provide statistics concerning dealings by the Office of Field Operations with applicants for admission at ports of entry located in San Diego County, and statistics for illegal alien apprehensions by the [the Border Patrol] in San Diego Sector, between January 7, 2004-February 27, 2004.  These statistics will be provided to [Judicial Watch] under separate cover.

DHS's Reply at 11.  As Judicial Watch points out, Pl.'s Reply at 2, this statement is troubling for several reasons.  For starters, contrary to the DHS's assertion that Judicial Watch has only now clarified "the types of records and the time frame for which it wants statistics," DHS's Reply at 11, its FOIA request specifically sought "[a]ny and all records that refer and/or relate to the number of illegal immigrants apprehended in San Diego county from January 7, 2004 to the present [i.e., February 27, 2004]," Pl.'s Facts ¶ 2.  The DHS's admitted failure to appreciate the scope of Judicial Watch's clearly defined request casts doubt on the adequacy of its search.  This failure is particularly perplexing considering that the DHS did release "[b]order [s]tatistics" for a time period well outside the scope of Judicial Watch's FOIA request, Pl.'s Mem. at 17, while overlooking statistics that were actually responsive to the request.  In addition, the DHS's statement is essentially an admission that the agency possessed responsive records that would have been uncovered through a reasonable search, but that it nonetheless failed to provide to Judicial Watch.  This "positive indication[] of overlooked materials" in the face of Judicial Watch's "well defined request[]" raises "substantial doubt" as to "the adequacy of [the DHS's] search," thus rendering summary judgment in the DHS's favor "inappropriate."  Iturralde, 315

F.3d at 314 (internal quotation marks and citation omitted).  Lastly, despite the DHS's offer to provide the responsive records to Judicial Watch "under separate cover," DHS's Reply at 11, Judicial Watch states that it has "not yet received these documents," nor has it "heard from [the] DHS about when it can expect to receive them," as of the date its reply brief was filed, Pl.s Reply at 3.  Accordingly, the Court will order the DHS to conduct an additional search for documents responsive to Judicial Watch's request for "[a]ny and all records that refer and/or relate to the number of illegal immigrants apprehended in San Diego county from January 7, 2004 to the present [i.e., February 27, 2004]," Pl.'s Facts ¶ 2, and direct the agency to file a supplemental declaration describing that search.  The DHS must also produce forthwith to Judicial Watch any records within its possession that it has already identified as responsive to the foregoing FOIA request.

**5.     Judicial Watch's Request for Additional Searches**

Judicial Watch also requests that the DHS be ordered to search the four component offices of Customs that declined to conduct searches in response to the Acting Commissioner's February 2006 memorandum.  See Pl.'s Reply at 4.  However, Judicial Watch presents no factual basis for its position that these offices may possess responsive records, and the Suzuki declaration makes clear that the offices did not perform searches because the subject matter of Judicial Watch's FOIA request is entirely unrelated to their functions.  See DHS's Mem., First Suzuki Decl. ¶¶ 25-28 (stating that the Office of Training and Development, the Office of Finance, the Office of Human Resources Management, and the Office of the Special Assistant to the Commissioner for Equal Employment Opportunity did not perform searches for responsive records upon receiving the Acting Commissioner's memorandum because the FOIA request was outside of the scope of the office's functions).  Because the FOIA does not obligate agencies to

undertake fishing expeditions in offices that are not reasonably likely to possess responsive

records, see Kowalczyk, 73 F.3d at 389, Judicial Watch's request must be denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the DHS's renewed motion for

summary judgment must be denied without prejudice, and that Judicial Watch's renewed cross-

motion for partial summary must be granted in part and denied in part without prejudice.

Specifically, because the DHS failed to describe with sufficient detail the searches of several of

the component offices within Customs, it must submit an additional declaration supplementing

those descriptions, taking into account the deficiencies identified by the Court.  The Court also

rejects Judicial Watch's challenges to the DHS's search that are premised on allegedly

inconsistent and erroneous statements in the agency's submissions and purportedly missing

documents.  However, the DHS must conduct a new search for documents responsive to Judicial

Watch's request for "[a]ny and all records that refer and/or relate to the number of illegal

immigrants apprehended in San Diego county from January 7, 2004 to the present [i.e., February

27, 2004]," Pl.'s Facts ¶ 2, and provide a supplemental declaration describing that search.  And

the DHS must produce forthwith to Judicial Watch any records within its possession that it has

already identified as responsive to the foregoing FOIA request.

SO ORDERED this 30th day of April, 2012.[6]

REGGIE B. WALTON
United States District Judge

---

[6] The Court will contemporaneously issue an order consistent with this memorandum opinion.